IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FRANK L. MCKINNIE,                    )
                                      )
            Plaintiff,                )
                                      )    Case No. 09 C 0614
      v.                              )
                                      )    Magistrate Judge Nan R. Nolan
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Frank McKinnie claims that he is disabled because of arthritis, muscle spasms, back pain, gout, hypertension, and obesity. He seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and have filed cross-motions for summary judgment. For the reasons explained below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Mr. McKinnie applied for DIB and SSI on August 1, 2006, alleging that he became disabled on April 15, 2001.[1] (R. 155-62). The application was denied initially on September 28, 2006, and upon reconsideration on December 20, 2006. (R. 74-77). Mr. McKinnie appealed the Commissioner's decision and requested an administrative hearing on January 29, 2007. (R.

---

[1] This is Mr. McKinnie's second application for Social Security benefits; he applied and was denied in 1989. (R. 147).

101).  The hearing was held before an Administrative Law Judge (the "ALJ") on July 10, 2008.

(R. 30-73).  On September 11, 2008, the ALJ denied Mr. McKinnie's claims for benefits.  (R. 15-

17).  The ALJ found that Mr. McKinnie has multiple severe impairments, but that he retains the

capacity to perform jobs that exist in sufficient numbers in the national economy.  (R. 18-29).

On December 19, 2008, the Appeals Council denied Mr. McKinnie's request for review.  (R. 1-

3).  Thereby, the ALJ's decision became the final decision of the Commissioner.  <u>See</u> 20 C.F.R

§ 416.1481.

## FACTUAL BACKGROUND

Mr. McKinnie was born on November 24, 1959, and was 48 years old at the time of the

hearing before the ALJ.  (R. 159).  He has two years of college education.  (R. 38).  Mr.

McKinnie's injuries date back to a car accident in 1989.  (R. 39-40).  He testified that he had to

undergo therapy "to learn how to walk and everything again" after the accident.  (R. 40).  Mr.

McKinnie then worked as a fork lift operator and materials handler until April 15, 2001, when he

ceased working entirely.  (R. 169).  Mr. McKinnie sought certification in asbestos removal in

2003, but he was unable to complete the physical portions of the training and thus could not

commence work in the field.  (R. 38-39).

## A.    Medical Evidence

Although several of Mr. McKinnie's impairments stem from his 1989 car accident, the

first medical report in the record is from February 6, 2003, when Mr. McKinnie sought a physical

from his regular physician, Dr. Bernie Thomas of the Woodlawn Adult Health Center, pursuant

to Mr. McKinnie's asbestos removal training.  (R. 253).  At that appointment, Dr. Thomas

evaluated Mr. McKinnie for hypertension, examined his wrist and the pin that had been placed

in it following his car accident, and subsequently determined that Mr. McKinnie had tested

positive for Hepatitis B.  (R. 216-17).

The next medical report in the record is from October 25, 2005, when Mr. McKinnie had another checkup with Dr. Thomas. (R. 250). Dr. Thomas' notes are generally illegible, but Dr. Thomas did note clearly that Mr. McKinnie still complained of lower back pain and knee pain, as well as right wrist and right ankle trauma from the 1989 car accident. Id. Dr. Thomas also noted tenderness on examination and a limited range of motion, and prescribed Robaxin, Ibuprofen, and Tylenol. Id. At Mr. McKinnie's hearing, the ALJ noted that there were no medical reports in the record from February 2003 to October 2005. (R. 51). Mr. McKinnie explained that this gap exists because "my grandmother started forcing me to go to the doctor more because I'm actually afraid of doctors." Id.

Mr. McKinnie returned to Dr. Thomas for three more checkups between January and July of 2006. (R. 248-49, 251). Notes from these checkups reveal diagnoses of hypertension and obesity, as well as referral to an orthopedic specialist to further examine Mr. McKinnie's lingering injuries from the 1989 car accident. Id. On February 23, 2006, Mr. McKinnie underwent x-ray examinations at Stroger Hospital of Cook County for multiple pain sites. (R. 234-41). The x-rays revealed mild diffuse degenerative changes in Mr. McKinnie's right ankle, left knee, right wrist, and spine. Id. On April 3, 2006, an orthopedic doctor reviewed the x-rays and examined Mr. McKinnie's right ankle, left knee, right wrist, and spine. (R. 242). The orthopedist's full diagnosis is difficult to discern, but his notes reveal findings of osteophytes on Mr. McKinnie's spine and right wrist. Id. The orthopedist also noted that surgery was not needed at the time, but that Mr. McKinnie should return to his regular treating physician to manage his chronic pain. Id.

Mr. McKinnie also underwent consultative examinations by the Bureau of Disability Determination Services ("DDS") in September of 2006. (R. 22). Liana G. Palacci, D.O., performed the first consultative examination on September 12, 2006. (R. 221-24). Her clinical impressions were complaints of low back pain and history of right ankle fracture. (R. 224).

Next, non-examining medical consultant, Barry Free, M.D., reviewed Mr. McKinnie's file for allegations of arthritis, lower back pain and a broken right ankle on September 21, 2006. (R. 226-27). Dr. Free found Mr. McKinnie had cooperated but that there was not enough objective medical evidence to make a disability determination. Id. Paul Smalley, M.D., another non-examining medical consultant, also examined the file on September 21, 2006, and found Mr. McKinnie's combination of impairments to be non-severe. (R. 228-29). Upon reconsideration on December 12, 2006, Calixto Aquino, M.D., a third and final non-examining medical consultant, confirmed Dr. Smalley's assessment without explanation.

Mr. McKinnie returned to see Dr. Thomas regarding his health conditions in January, May, and September of 2007. (R. 262-64). During the May 2007 examination, Dr. Thomas first diagnosed Mr. McKinnie with gout and also noted a diagnosis of "CKD." (R. 263). Dr. Thomas reconfirmed this diagnosis of gout during the September 2007 examination, and again noted a diagnosis of "CKD." (R. 262). The most common medical definition of "CKD" is Chronic Kidney Disease.[2]

The final two medical reports in the record are Dr. Thomas' answers to an Arthritis Residual Functional Capacity Questionnaire on February 14, 2008 (R. 244-46) and Dr. Thomas' notes from a checkup with Mr. McKinnie on April 7, 2008. (R. 261). With regard to Mr. McKinnie's Residual Functioning Capacity ("RFC"), Dr. Thomas noted diagnoses of CKD, gout, and hypertension. (R. 244). He stated that Mr. McKinnie experienced pain at an intensity of 8, with objective signs of reduced range of motion, joint instability, sensory changes, tenderness, redness, and muscle spasms. Id. Dr. Thomas opined that Mr. McKinnie's symptoms would frequently be severe enough to interfere with the attention and concentration needed to perform simple work tasks during a typical workday. (R. 245). Dr. Thomas further asserted that Mr. McKinnie could remain standing and sitting for 30 minutes each before needing to change

---

[2] National Kidney Foundation – Chronic Kidney Disease, http://www.kidney.org/kidneydisease/ckd/

positions, and that in an 8-hour workday he could sit and stand/walk for less than 2 hours each, although he would not need a job that would permit shifting positions from sitting, standing, or walking at will.  Id.  Dr. Thomas also stated that with prolonged sitting Mr. McKinnie's legs should be elevated to a level of 4 feet; if Mr. McKinnie had a sedentary job, his legs would need to be elevated 15% of the time.  Id.  Mr. McKinnie could never lift 50 or even 20 pounds in a competitive work situation according to Dr. Thomas, but he could rarely lift 10 pounds and occasionally less than 10 pounds.  (R. 246).  Dr. Thomas concluded that Mr. McKinnie's impairments were likely to produce "good days" and "bad days," and that we would be absent from work due to his impairments four days per month on average.  Id.  At the final checkup in the record from April 7, 2008, Dr. Thomas again noted diagnoses of gout and CKD.  (R. 261).

**B.    Plaintiff's Testimony**

Mr. McKinnie testified before the ALJ on July 10, 2008, with attorney Matthew Edwards as his counsel.  (R. 30-73).  As noted above, Mr. McKinnie testified that his injuries began with a motor vehicle accident in 1989.  (R. 39).  Following his recovery, which took two and a half years, Mr. McKinnie could no longer work in construction as he had before.  (R. 40).  He testified that he was able to perform forklifting jobs for several years, but quit forklift work in 1998 because he could not handle the pains from driving the forklift anymore.  Id.  Mr. McKinnie then transitioned to work as a material handler, which involved lifting 40 to 50 pounds at times, but he testified that he got to the point where he could not do that work anymore either because he was losing his balance frequently.  (R. 40-41).

Mr. McKinnie further testified that he then started trying to see his physician more often due to his "severe pains."  (R. 41).  He stated that he suffered broken bones in his car accident of 1989 that ranged from his ribs through his left knee, including his wrist in three places.  (R. 41-42).  Surgeons could not operate on his back at the time, Mr. McKinnie testified, because the damage was too close to his spinal cord.  (R. 42).

Mr. McKinnie explained that he lives on the second floor of a family-owned apartment building with his aunt and uncle. (R. 42). He needs to use the handrail to get up and down the stairs to the apartment. Id. He does not drive and has not driven for "some years," because his feet would go numb on the pedals. (R. 42-43). Mr. McKinnie testified that in his daily life he does not help with any household chores, other than trying to wash a few dishes to keep his wrist activated as part of his therapy. (R. 43). He also testified that he tries to use the vacuum because it is good exercise to move back and forth and it helps his balance. Id. Mr. McKinnie said he uses public transportation "[s]ometimes, but not too much." (R. 44).

Mr. McKinnie stated that he spends his days trying to keep moving so that he can avoid muscle spasms that force him to lie down, and so that he can ambulate without using his assistive devices. Id. Mr. McKinnie testified that he was using an umbrella on the day of the hearing instead of a cane because he "can't carry both," but that he has "a cane, crutches, walker, and a wheelchair." (R. 45-46). He testified that he uses his crutches when his feet get so swollen that he can't put pressure on them, and his cane on a regular basis for balance. (R. 46-47). On one occasion six months prior to the hearing, the swelling of his feet got so bad, Mr. McKinnie testified, that he fell and injured himself and had to be taken to the emergency room. (R. 48, 50, 53). Mr. McKinnie testified that every time he moves, his body "pop[s] like popcorn." (R. 51). He testified that he wears back and ankle braces from time to time. (R. 52). Mr. McKinnie takes medicine for muscle spasms, arthritis, gout, high blood pressure, high cholesterol, and pain. (R. 52-53).

Mr. McKinnie testified that he was worse off at the time of the hearing than he was when he attempted the asbestos removal class in 2003. (R. 57). He testified that by October of 2005 he was having painful back spasms every day. (R. 59). Mr. McKinnie testified that he would have good days and bad days. On bad days, he could not get up properly and he would have to sit in the bathtub and do his therapy for "two or three hours" before he could try to "start the

day over again." (R. 59). He testified that he usually sits in a wheelchair or a recliner during the day to elevate his legs and "keep off the pressure so the fluid could run back down." (R. 49, 60-61, 64). When asked how far off the ground he needed to elevate each leg usually, the record reflects that Mr. McKinnie "guess[ed] about 3" or more, maybe farther" so that he could "straighten it out." (R. 61-62). The following exchange then occurred between Mr. McKinnie and his counsel:

> Q: – straight?
>
> A: Yeah.
>
> Q: So that would be more, I guess that's –
>
> A: If I can get it higher –
>
> Q: Is that to the length of this computer here?
>
> A: Yeah.

(R. 62).

## C.  Vocational Expert Testimony

Susan Adenberg, a vocational expert ("VE"), testified before the ALJ that Mr. McKinnie's past work as a forklift driver was heavy, semi-skilled, and his work as a material handler was heavy, unskilled. (R. 66). The ALJ then presented the VE with three hypothetical vocational profiles. (R. 66-71).

For the first hypothetical, the ALJ asked the VE to consider whether an individual with the same age, educational background, and work experience as Mr. McKinnie would have the functional capacity to lift and carry ten pounds frequently and 20 pounds occasionally, to sit for 6 hours and stand and walk for 6 hours in an 8 hour day, and push and pull a commensurate amount of weight, with occasional stairs, ramps, stooping, and crouching, but no ladders. (R. 66). The VE testified that this individual could not perform Mr. McKinnie's past work because of the level of exertion that would be required, and that Mr. McKinnie does not have any

transferable skills. Id. When asked whether this hypothetical individual could perform any jobs in the regional economy, the VE testified that what the ALJ had described was "basically light unskilled work," such that the individual could do light housekeeping, cashier, and packer work, and there were over 100,000 such positions combined in the Chicago metropolitan area. (R. 67).

For the second hypothetical, the ALJ maintained the same strictures as the first hypothetical except that the functional capacity would involve sitting for 4 hours and standing and walking for 4 hours. Id. The VE responded that there would still be about 8,000 cashier jobs for this individual and 4,000 each of packer and assembler jobs. Id. At this point, the ALJ asked the VE if her opinion was consistent with the DOT, and she responded "[y]es, I believe so." Id.

For the third and final hypothetical, the ALJ asked the VE to consider an individual that could lift no more than 10 pounds and alternate sitting and standing through the day, sitting 30 minutes and standing 30 minutes. Id. The individual's legs could be elevated on a footstool when seated. Id. Occasional pushing and pulling would be required, as would occasional stairs, ramps, stooping, crouching, crawling, kneeling, and balancing. (R. 67-68.) No use of ladders would be required and the individual would be able to avoid concentrated exposure to hazardous machinery and unprotected heights. (R. 68). Before answering, the VE sought clarification on what the ALJ considered to be the height of a footstool. Id. The ALJ responded that it would be "a 15 percent grade off the horizontal," because she mistakenly thought that Dr. Bernie Thomas had called for an elevation of that height in his RFC analysis of Mr. McKinnie. Id. In actuality, Dr. Thomas had called for leg elevation to a height of four feet for 15 percent of the time Mr. McKinnie would be required to sit. (R. 245). Once the VE corrected the ALJ's misunderstanding, the ALJ asked the VE to answer the hypothetical the way it had been given to her. (R. 69). The VE responded that if the only elevation required was "just a few inches off

the ground . . . that would not affect sedentary sit stand option jobs." Id. The VE testified that there would be about 3,000 assembler positions available with such specifications, as well as 3,000 to 4,000 packer positions and about 1,000 inspection positions. Id. The VE concluded: "[i]f the elevation was of a more significant amount of, parallel or even higher, you know, of the height, then there would not be any jobs." Id.

Upon questioning of the VE by Mr. McKinnie's counsel regarding how much leg elevation would be too much elevation to interfere with sedentary work, the ALJ interjected that "about a foot and a half, is about the size of a footstool." (R. 70). The VE responded "[a]nd that's just about parallel, your, your leg is pretty much parallel at that point, I believe." Id. After further discussion the ALJ stated that the footstool she was talking about was actually one foot tall. Id. The VE's response to the ALJ's adjustment was the following:

> You know, I think what I'm trying to say, I have a hard time with, with doing that, but if you're just slightly elevating your leg . . . that's not a problem. But if your leg has to be parallel or higher, then you can't perform a job where you're sitting at a bench and doing work activity. I think that's the only way I can explain it.

(R. 70-71).

The VE also testified that an individual who had to miss three days of work per month could not sustain any of the jobs listed in the three hypotheticals posed by the ALJ, because that would exceed the tolerated absentee rate. (R. 71). Upon questioning by the ALJ on the amount of absence from work that would be tolerated, the VE responded that "[o]ne day a month, 12 sick days a year is the norm." (R. 72).

## D.     The ALJ's Decision

The ALJ found that Mr. McKinnie met the insured status requirements of the Act through March 31, 2006, and that he had not engaged in substantial gainful activity since the alleged onset date of his disability, which was April 15, 2001. (R. 20). The ALJ also determined that Mr. McKinnie "has the following severe impairments: obesity; hypertension; mild diffuse

degenerative changes to right ankle, left knee and right wrist; moderate diffuse degenerative changes of lumosacral [sic] spine with moderate narrowing of L3-4 and L4-5 vertebral joint spaces; and gout first noted on May 14, 2007." Id. The ALJ found that Mr. McKinnie did not, however, have an impairment or combination of impairments that met or equaled those listed in the Social Security Regulations. (R. 24).

The ALJ then set forth a bifurcated RFC. (R. 24). From April 15, 2001 to January 31, 2008, the ALJ determined that Mr. McKinnie could lift/carry 20 pounds occasionally and 10 pounds frequently; he could sit 6 hours and stand/walk 6 hours in an 8-hour workday; he had unlimited pushing/pulling, and he could occasionally climb stairs/ramps, stoop and crouch, but not climb ladders. Id. From February 1, 2008 to the present, the ALJ found that Mr. McKinnie has the more limited RFC to lift/carry less than 10 pounds frequently and 10 pounds occasionally; he can sit 30 minutes and stand/walk 30 minutes throughout the day; he can occasionally push/pull with upper and lower extremities; he can occasionally use stairs, ramps, stoop, crouch, crawl, kneel and balance, but not climb ladders; he should avoid concentrated exposure to hazardous machinery and unprotected heights; he can use a footstool when seated; and he would be absent from work one day per month. Id.

In so ruling on Mr McKinnie's RFC, the ALJ dismissed Dr. Thomas' diagnosis of CKD:

> Dr. Thomas gives a diagnosis of "CKD" which is not defined nor reduced to functional limitations. The claimant's attorney believes it means "chronic kidney disease." Even if this is so, which is not established by the record, there is no evidence of functional limitations from such a condition in the treatment notes or the opinion of Dr. Thomas.

(R. 26). The ALJ additionally gave only some weight, rather than controlling weight, to the RFC of Dr. Thomas. Id. She stated that Dr. Thomas' "conclusions limiting claimant to less than 4 hours of work daily, expecting absences more than 4 times a month, requiring the use of a walker, and elevating the leg 4 feet, are not supported by any objective evidence." (R. 26-27). With regard to Dr. Thomas' RFC regarding the four foot leg elevation level in particular, the ALJ

gave "this assessment little weight," as she could "see no evidentiary basis for using more than a footstool." (R. 27).

The ALJ determined, on the basis of the VE's testimony, that Mr. McKinnie is unable to perform any past relevant work. (R. 28). She felt, however, that the VE's testimony supported a finding that Mr. McKinnie could perform light work from April 15, 2001 to January 31, 2008, and that he could perform sedentary work from February 1, 2008 to the present. (R. 28-29). Therefore, the ALJ held that Mr. McKinnie has not been disabled under the Act from April 15, 2001 through the date of her decision, precluding any award of benefits. (R. 29).

<u>**DISCUSSION**</u>

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. <u>See</u> 42 U.S.C. § 405(g). The court's review is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the ALJ applied the correct legal standards in reaching her decision. <u>Nelms v. Astrue</u>, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to [her] conclusion." <u>Young v. Barnhart</u>, 362 F.3d 995, 1002 (7th Cir. 2004). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." <u>Steele v. Barnhart</u>, 290 F.3d 936, 940 (7th Cir. 2002).

**B.      Five-Step Inquiry**

To recover SSI and DIB under Titles II and XVI of the Act, a claimant must establish that he has a "disability" within the meaning of the Act. 42 U.S.C. § 1382(c)(3)(A); <u>Briscoe ex. rel. Taylor v. Barnhart</u>, 425 F.3d 345, 351 (7th Cir. 2005). An individual is disabled if he is unable to

perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905. To determine whether a claimant is disabled under the Act, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of the specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? See 20 C.F.R. § 416.920; Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir.2000). If the claimant makes it past step four, the burden shifts to the ALJ to demonstrate that claimant can perform a significant number of jobs that exist in the economy. See Young, 362 F.3d at 1000.

## C. Analysis

Mr. McKinnie raises five arguments in support of his request for reversal and remand: (1) the ALJ's discussion of Mr. McKinnie's combination of impairments was inadequate; (2) the ALJ "played doctor" and made independent medical findings not supported by the record; (3) the ALJ improperly rejected evidence of Chronic Kidney Disease, and erred by failing to re-contact Mr. McKinnie's treating physician; (4) the ALJ's questioning of the VE did not satisfy the requirements of SSR 00-4p; and (5) the ALJ did not properly analyze Mr. McKinnie's impairments under Listing 1.03. Each of these arguments is addressed below.

### 1. Evidence of Chronic Kidney Disease

Mr. McKinnie argues that the ALJ improperly rejected evidence in the record of a diagnosis of "CKD" by his treating physician, Dr. Bernie Thomas, and that she should have recontacted Dr. Thomas to clarify his diagnosis if the record reflected uncertainty. As noted above, the ALJ stated in her decision that "[t]he claimant's attorney believes [CKD] means 'chronic kidney disease.' Even if this is so, which is not established by the record, there is no

evidence of functional limitations from such a condition in the treatment notes or the opinion of Dr. Thomas." (R. 26). Mr. McKinnie argues that the ALJ's lack of consideration of the CKD diagnosis was harmful because Mr. McKinnie has multiple symptoms of Chronic Kidney Disease that relate to his impairments, rendering the ALJ's decision inadequate.

In response, the Commissioner argues that the ALJ's lack of consideration of the CKD diagnosis is irrelevant because the ALJ "found at least one severe impairment, and moved on to consider Mr. McKinnie's symptoms and limitations as a whole." (Doc. # 22 at 6). The Commissioner's argument is unavailing because Mr. McKinnie is not challenging the ALJ's failure to account for his CKD at step two. See Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir.2003) (stating "[h]aving found that one or more of [appellant's] impairments was severe, the ALJ needed to consider the aggregate effect of the entire constellation of ailments."); Morgan v. Astrue, 2009 WL 650364, *8 (N.D. Ill. Mar. 9, 2009) (stating "[t]he minimal articulation standard does not require the ALJ to cite and discuss every piece of evidence in detail at this threshold step, when the ALJ's finding was in plaintiff's favor. . . . '[A]s long as the ALJ proceeds beyond step two, no error can result from that analysis'"). Rather, the Court views Mr. McKinnie's argument as an attack on the ALJ's RFC finding. The ALJ has the duty to fully consider all the evidence of Mr. McKinnie's restrictions in the record in determining his RFC. See SSR 96-8p ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.").

As Mr. McKinnie points out, his high blood pressure and complaints of swollen feet (R. 46, 48, 53), muscles spasms (R. 40, 44, 59), back pain (R. 59), and headaches (R. 60) are consistent with a diagnosis of chronic kidney disease. See MayoClinic.com, http://www.mayoclinic.com/health/kidney-failure/DS00682/DSECTION=symptoms. Chronic kidney disease is also associated with gout, which Mr. McKinnie suffers from. The applicable

regulation requires the ALJ to recontact a treating physician when the physician's report contains a conflict or ambiguity that must be resolved, does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques.  20 C.F.R. § 404.1512(e); see also SSR 96-5p (stating if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").  The ALJ had a duty to recontact Dr. Thomas to seek clarification if she had a question about the validity of a chronic kidney disease diagnosis.

The ALJ's finding that "there is no evidence of functional limitations from such a condition in the treatment notes or the opinion of Dr. Thomas" is inaccurate because it does not account for Dr. Thomas' RFC evaluation.  On February 14, 2008, Dr. Thomas completed an RFC Questionnaire and noted diagnoses of CKD, gout, and hypertension.  (R. 244).  Dr. Thomas' RFC assessment then identified the functional limitations arising from these impairments.  (R. 245-46).  The ALJ's summary dismissal of the CKD diagnosis and resulting functional limitations and her failure to recontact Dr. Thomas for clarification indicate that her RFC analysis is not supported by substantial evidence.  The ALJ's error was not harmless.  Confirming a diagnosis of chronic kidney disease could lead to a different credibility and RFC finding.  In assessing Mr. McKinnie's credibility and determining his RFC, the ALJ dismissed many of Mr. McKinnie's self-described pain limitations as well as certain of Dr. Thomas' opinions because they were not supported by objective evidence.  (R. 25, 27).  On remand, the ALJ shall seek additional evidence from Dr. Thomas regarding Mr. McKinnie's CKD and his resulting functional limitations and restrictions.

### 2.    The ALJ's Discussion of Plaintiff's Combination of Impairments

Mr. McKinnie argues that the ALJ's discussion of his combination of impairments was inadequate.  In particular, Mr. McKinnie asserts that an improper RFC finding resulted from the

ALJ's failure to address the effect of his obesity on his other impairments, including arthritis, degenerative changes to the knee and ankle, degenerative changes to the spine, narrowing of the vertebrae, hypertension, and gout.

When a claimant alleges a variety of impairments, the ALJ must consider "the *aggregate* effects of the entire constellation of impairments." Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). Obesity should be considered, singly and in combination with other impairments, at the RFC assessment stage of the disability determination process. See SSR 02-1p at *6 (also noting that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity."). The Seventh Circuit has affirmed that the effect of obesity on a claimant's other impairments must be examined in order for an RFC assessment to be sufficiently comprehensive. See Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) ("Sometimes . . . obesity . . . merely aggravates a disability caused by something else; it still must be considered for its incremental effect on the disability").

Although the ALJ explicitly considered whether Mr. McKinnie met the prior listing for obesity (9.09), and "noted Mr. McKinnie's weight no fewer than a dozen times throughout her decision" as the Commissioner contends (Doc. # 22 at 4), the ALJ did not discuss how Mr. McKinnie's obesity interacted with his other impairments in her RFC assessment. The ALJ's multiple references to Mr. McKinnie's weight (R. 21-22, 24) are not coupled with any analysis of how his weight operates in conjunction with his other impairments. Because the ALJ failed to provide an adequate analysis of Mr. McKinnie's combination of impairments, her RFC determination is not supported by substantial evidence. See Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding error in the ALJ's failure to discuss the impact of claimant's obesity on her other impairments). On remand the ALJ shall consider the aggregate effect of Mr.

McKinnie's impairments, discussing the manner in which his obesity impacts his other diagnoses.

### 3. The ALJ's Independent Medical Findings

Mr. McKinnie argues that the ALJ "played doctor" and made independent medical findings that are not supported by the record when she held that he could perform sedentary work because he could elevate his legs on a footstool when seated and might be absent from work only once a month. (Doc. # 17 at 9). An ALJ may not substitute her own opinions regarding medical conditions for those of medical professionals. See, e.g., Myers v. Astrue, No. 2009 WL 2746245 at *7 (N.D. Ill. Aug. 26, 2009) (stating "[i]t is well established that '[a]n ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.'") (citation omitted); Blakes ex rel Wolfe v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003) (finding that the ALJ improperly made a medical conclusion that was not supported by the evidence in the absence of medical testimony at the hearing).

Mr. McKinnie's treating physician, Dr. Thomas, found that Mr. McKinnie would have to elevate his legs to a height of four feet for fifteen percent of a workday to prevent stiffness, and that his impairments would cause him to be absent from work for four days per month on average. (R. 245-46). The vocational expert testified at the hearing that there would be no sedentary jobs for an individual who needed to elevate his legs to a parallel level (eighteen inches) or higher during the workday, nor would there be jobs for an individual whose impairments caused him to be absent from work three times per month. (R. 70-71). When the ALJ told the VE to include a requirement of elevating legs on a twelve inch footstool when seated, the VE testified that she would "have a hard time with, with doing that, but if you're just slightly elevating your leg . . . that's not a problem. But if your leg has to be parallel or higher, then you can't perform a job while you're sitting at a bench and doing work activity. Id. The ALJ declined to find that Mr. McKinnie was required to elevate his legs at the four feet level because

she found no objective support for that requirement in the record.  (R. 27).

The record does not support the ALJ's RFC finding regarding how high Mr. McKinnie needs to elevate his legs.  The ALJ must build "an accurate and logical bridge from the evidence to his conclusion."  Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003).  The ALJ found that Mr. McKinnie needs to elevate his legs twelve inches (as on a footstool).  (R. 27, 70) (stating "Okay, the footstool, the footstool I was talking about before was 1', 12'', the first footstool.").  There is nothing in the record, either in the form of medical evidence or testimony, which specifically indicates that Mr. McKinnie needed to elevate his legs at a height of twelve inches.  The only explanation given for the ALJ's conclusion is her statement that she "accept[s] Dr. Thomas' finding that the claimant needs to elevate his legs when seated, but see[s] no evidentiary basis for using more than a footstool."  (R. 27).  The ALJ gave Dr. Thomas' assessment of the required leg elevation "little weight," however, finding that he was "without any explanation for such high elevation."  (R. 27).  The ALJ did not cite or discuss any evidence contradicting Dr. Thomas' assessment.  The ALJ impermissibly made her own conclusion regarding the height Mr. McKinnie needs to elevate his legs.  Blakes, 331 F.3d at 570 (holding an ALJ improperly "play[s] doctor" when she makes a medical conclusion without expert evidence).

The Commissioner argues that the ALJ did not "play doctor" because "she simply relied on Mr. McKinnie's own statements in determining more reasonable footstool elevation and one-day-per-month absence restrictions."  (Doc. # 22 at 5).  The record does show that at one point during his testimony, Mr. McKinnie stated that he only needed to elevate each leg about three inches "or more, maybe farther" so that he could "straighten it out."  (R. 61-62).  Mr. McKinnie's testimony as a whole is unclear as to the height at which he needed to elevate his legs. McKinnie testified that he sits in a recliner or wheelchair to elevate his legs and "keep off the pressure so the fluid could run back down," which may be interpreted to mean that he needs to

elevate his legs at waist level height.  (R. 49, 60-61, 64).  In any event, the Commissioner may not supply the ALJ's reasoning for her, however, and here the ALJ did not reference Mr. McKinnie's testimony in independently deciding the level to which his legs should be elevated. See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) (stating "regardless of whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

Mr. McKinnie also challenges the ALJ's finding that he would be absent from work one day per month due to his impairments.  The ALJ failed to cite any evidence in the record to support her conclusion.  Arguably, the ALJ was obliquely referencing Mr. McKinnie's testimony when she stated that "giving claimant the benefit of the doubt concerning his symptoms, he might be absent from work once a month."  (R. 27).  Still, this determination of one likely absence per month is arbitrary, as is the determination that Mr. McKinnie's legs need only be elevated to the height of a footstool.  The ALJ simply did not explain how she arrived at these calculations, contrary to the requirements of SSR 96-8p, which provides that an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  See Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005) ("[c]ontrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

The Commissioner cites two cases, Schmidt v. Astrue, 496 F.3d 833 (7th Cir. 2007), and Diaz v. Chater, 55 F.3d 300 (7th Cir. 1995), for the proposition that it is irrelevant that the ALJ's "limitations were not necessarily derived from a specific medical opinion." (Doc. # 22 at 5). These two cases are inapposite, however, because they discuss the ALJ's duty to resolve conflicting medical evidence.  In this case, the issue is not that the ALJ wrongfully chose one

medical opinion over another, but rather that the ALJ did not meet the "logical bridge" requirement for the opinions she came up with. As such, the ALJ's RFC assessment was not supported by substantial evidence, and it must be re-evaluated on remand.

### 4.    The ALJ's Questioning of the VE

Mr. McKinnie argues that the ALJ erred in her questioning of the VE because she did not ask whether the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT) after the VE had finished testifying. Instead, the ALJ asked the VE if her testimony was consistent with the DOT after the second hypothetical out of three posed by the ALJ. (R. 67.) Mr. McKinnie asserts that this timing is harmful because he claims that the VE's ensuing testimony was inconsistent with the DOT, and therefore the ALJ was wrong to rely on it.

The ALJ has an affirmative duty to ask the VE whether her testimony is consistent with the DOT. SSR 00-4p; Prochaska v. Barnhart, 454 F.3d 731, 735-36 (7th Cir. 2006). The plain language of SSR 00-4p suggests that the ALJ should ask the VE whether her testimony is consistent with the DOT after the VE has finished testifying: the ALJ should ask the VE "if the evidence he or she *has provided* conflicts with information provided in the DOT" (emphasis added). Indeed, the Northern District of Indiana has held that "SSR 00-4p places an affirmative duty on the ALJ to resolve conflicts between the evidence the VE has provided and the Dictionary of Occupational Titles after the VE has testified," and that "[t]he ALJ cannot transfer his duty to the VE." Kallio v. Astrue, 2009 WL 500552 *9 (N.D.Ind., February 27, 2009).

Mr. McKinnie is correct that the ALJ did not expressly ask the VE if her testimony in response to the third hypothetical conflicted with the DOT. The Commissioner notes, however, that the Seventh Circuit has applied harmless error analysis to an ALJ's failure to inquire about possible conflicts between the VE's testimony and the DOT. See Ketelboeter v. Astrue, 550 F.3d 620, 625-26 (7th Cir. 2008) (finding the ALJ's failure to ask the VE if his testimony conflicted with the DOT harmless because the DOT's job descriptions were not inconsistent with

the hypothetical limitations given by the ALJ). Mr. McKinnie argues that the ALJ's failure to question the VE regarding any inconsistencies with the DOT after her testimony was finished is harmful, though, because "[t]he jobs the ALJ found for Plaintiff were sedentary jobs, but the ALJ did not ask the VE to clarify whether a person could perform jobs primarily requiring sitting when he had to alternate sitting and standing every 30 minutes," as the ALJ's RFC provides. (Doc. # 23 at 10); 20 C.F.R. § 404.1567(a) (defining "a sedentary job . . . as one which involves sitting," although "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

There is some question here whether the jobs identified by the VE in response to the third hypothetical require abilities outside the ALJ's assessed RFC, which would constitute a conflict between the VE's testimony and the DOT. The ALJ's third hypothetical required, among other limitations, alternate sitting and standing every 30 minutes. (R. 67-68). The VE listed the assembler, packer, and inspector positions as jobs that the representative person could perform and classified them as "sedentary sit stand option jobs." (R. 69). Contrary to the Commissioner's argument, the ALJ limited Mr. McKinnie to performing sedentary work as of February 2008. (R. 27) (stating as of February 2008, "I now conclude that he is capable of sedentary exertion with additional limitations stated in his RFC."); see also (R. 29) (stating "[a]ccording to the vocational expert, claimant's RFC from February 1, 2008 to present is sedentary in exertional level."). At step five, the ALJ found Mr. McKinnie was not disabled as of February 2008 because he could perform the 3,000 assembler, 3,000 to 4,000 packer, and 1,000 inspector positions identified by the VE at the hearing.

The VE's response to the hypothetical was inconsistent with Mr. McKinnie's limitations and did not match the DOT's classification of those jobs as sedentary. A job is sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a); SSR 83-10 at *5. "'Occasionally' means occurring from very little up to one-third

of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10 at *5. The limitation of alternative sitting and standing every 30 minutes is inconsistent with standing not more than 2 hours out of an 8-hour workday, and thus, exceeds Mr. McKinnie's limitations. Because the identified sedentary jobs of assembler, packager, and inspector appear to exceed Mr. McKinnie's assessed limitations, an apparent conflict exists between the VE's testimony and the DOT's definition. On remand, the ALJ must explore this potential inconsistency and obtain a reasonable explanation for this apparent conflict. See Prochaska, 454 F.3d at 736 (remanding because "[the court] will defer to an ALJ's decision if it is supported by 'substantial evidence,' but here there is an unresolved potential inconsistency in the evidence that should have been resolved.").

### 5.     The ALJ's Analysis of Plaintiff's Impairments Under Listing 1.03

Mr. McKinnie's final remaining argument is that the ALJ did not properly analyze his impairments under Listing 1.03. A claimant is presumptively disabled if his impairments meet the criteria for an impairment found in the Listing of Impairments. See 20 C.F.R. Pt. 404, Subt. P, App. 1; Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. §§ 404.1520(d), 404.1525(a)). Mr. McKinnie claims that he qualifies under Listing 1.03, which entails reconstructive surgery of a weight-bearing joint with inability to ambulate effectively as defined in Listing 1.00B2b. 20 C.F.R. Pt. 404, Subt. P, App. 1.

Listing 1.02B2b(2) provides the following examples of ineffective ambulation:

the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Id. Mr. McKinnie takes issue with the fact that the ALJ only stated that "there is no evidence

demonstrating an inability to ambulate effectively as outlined under 1.00B2b, as the claimant did not require a walker or two crutches to ambulate." (R. 24). Citing Moss v. Astrue, 555 F.3d 556 (7th Cir. 2009), Mr. McKinnie asserts that "the ALJ must consider the remainder of the examples listed in the rule." See Moss, 555 F.3d at 562-63 (stating "the ALJ failed to adequately consider whether [the claimant met] the listing based on the provided examples such as an inability to walk a block at a reasonable pace on rough or uneven surfaces, or the inability to carry out routine activities, like shopping and banking"). (Doc. # 17 at 14).

The present case is distinguishable from Moss. In Moss, the court held that the ALJ necessarily failed to adequately consider the ineffective ambulation listing because the ALJ's determination regarding the medical evidence was not supported by substantial evidence. Specifically, the ALJ in Moss erred in discounting the opinions of the treating orthopedic specialist who noted that claimant's right ankle had some early degenerative changes and features that suggested death of the bone tissue; that claimant's range of motion was quite limited; claimant experienced pain when she flexed her ankle; claimant had stiffness, tenderness, and diminished sensation in her right foot; claimant walked with a steppage gait pattern; and claimant used a cane. Moss, 555 F.3d at 558. Here, the ALJ thoroughly addressed the various indications of Mr. McKinnie's ability to ambulate effectively. (R. 21-23). In addition to the indications that reflected negatively on Mr. McKinnie's ability to ambulate, the ALJ noted many positive indications of that ability, including only mild diffuse degenerative changes to the right and left ankles; Mr. McKinnie's full range of motion of his left ankle; his ability to toe and heel stand; 5/5 strength over his lower bilateral extremities; Dr. Thomas' assessment that he can walk three blocks; Dr. Palacci's observation that Mr. McKinnie did not use a cane, had 5/5 strength over all extremities, and his gait was non-antalgic; that he sometimes takes public transportation; and Mr. McKinnie's testimony that he lives on a 2nd floor apartment where he is able to climb the stairs with the handrail. Id. Based on the ALJ's

adequate consideration of Mr. McKinnie's ability to ambulate in her decision, her conclusion that his impairments did not meet the criteria of Listing 1.03 was supported by substantial evidence.

## **CONCLUSION**

For the reasons stated above, the decision of the ALJ is reversed and this case is remanded to the Administration for further proceedings consistent with this opinion. Plaintiff's Motion for Summary Judgment [Doc. # 17] is granted.

**E N T E R:**

*Nan R. Nolan*

_____
**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:  March 26, 2010**